**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL SCOTT STRANGE,** | : | **Case No: 1:09-cv-00316** |
| On behalf of himself and all other | : | |
| persons similarly situated, known | : | |
| and unknown, | : | **Judge: Susan Dlott** |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| **MARTIN WADE, et al.** | : | |
| | : | |
| Defendants. | : | |

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**
_____

### I. STATEMENT OF THE FACTS

**A. MARTIN WADE FORMS DCHW, LLC TO OPEN A NEW FINE DINING RESTAURANT IN CINCINNATI, OHIO.**

In or about July 2000, Martin Wade received a phone call from Tom Huff informing him that Jean-Robert de Cavel (hereinafter "Jean-Robert"), the long time Chef de Cuisine at Cincinnati's Mobil Five Star restaurant The Maisonette, had expressed interest in leaving his position to start a new fine dining venture of his own. (Deposition of Martin Wade at 16). Mr. Huff further stated that he would be willing to invest in the restaurant if Mr. Wade would also join the enterprise. (*Id.*). Although Mr. Wade had never owned or operated a restaurant in the past, he was an experienced certified public accountant[1] and had served as tax advisor for the Barleycorns restaurant chain for twenty five years. *(Id.* at 7-8). Mr. Wade accepted the proposition on the

---

[1] Mr. Wade also had a B.S. in Finance, an M.B.A. in Management, and had earned his J.D. from the Chase College of Law in 1981. (Wade dep. at 5).

condition that the business was set up as a partnership between Mr. Huff, Mr. Wade, and Jean-Robert. (*Id.* at 17).

Several months later, the parties formed DCHW, LLC, a limited liability company organized to serve as the operating entity for the new restaurant. (*Id.* at 11-12, 17). Before the restaurant was opened, however, Mr. Huff withdrew from the corporation and Mr. Wade was faced with the decision whether to move forward as the sole investor. (*Id.* at 17). After several months of deliberation, Mr. Wade agreed to continue the project and modified the corporate structure of DCHW, LLC to give himself a 90% ownership interest and Jean-Robert a 10% interest.[2] (*Id.* at 17). Jean-Robert understood from the new arrangement that Mr. Wade would be responsible for the business side of the restaurant while he would be in charge of ensuring that high quality food was served each and every evening. (de Cavel dep. at 16, 46, 54). Shortly thereafter, Mr. Wade and Jean- Robert publicly announced their intention to open a new restaurant on Fourth Street in the space once occupied by Pigall's, a former Mobil Five Star restaurant that had been closed years earlier.

### B. RICHARD BROWN IS HIRED AS THE RESTAURANT'S MAITRE D'.

During the spring of 2002, several months before the scheduled opening of Jean Robert at Pigall's, Jean-Robert discussed with Richard Brown the possibility of the latter serving as the restaurant's Maitre d'. (Deposition of Jean-Robert de Cavel at 13-14, Deposition of Richard Brown at 19). Jean-Robert wanted Mr. Brown to join the staff at Pigall's because he had worked with him at the Maisonette and believed that Mr. Brown was the best maitre d' in the Cincinnati area. (de Cavel dep. at 13-14). Although Mr.

---

[2] In late 2003 Jean-Robert obtained an additional 10% interest in the corporation, so at all times relevant to the issues in this case Mr. Wade owned 80% of DCHW, LLC while Jean-Robert owned 20%. (Wade dep. at 17, de Cavel dep. at 17).

Brown was extremely interested in the position[3], he knew that he would not be able to accept less salary than the $75,000.00 he was currently earning as Maitre d' at The Cincinnatian. (Brown dep. at 20).

Following his conversations with Mr. Brown, Jean-Robert informed Mr. Wade that he would very much like to hire Mr. Brown but was not sure whether the new restaurant could afford such an expensive employee. (de Cavel dep. at 16, Wade dep. at 30). After some discussion, however, Mr. Wade told Jean-Robert that he would be able to pay Mr. Brown $75,000.00 per year. (Wade dep. at 31; de Cavel dep. at 16, 45). In or about May 2002, Mr. Wade met with Mr. Brown over breakfast to inform him that Pigall's would be able to meet his salary[4] requirement. (Wade dep. at 52-53; Brown dep. at 20). Mr. Brown left The Cincinnatian to aid in the final planning stages for the new restaurant. (Brown dep. at 9, 72).

### C. RICHARD BROWN ASSUMES AN ACTIVE MANAGEMENT ROLE AT JEAN ROBERT AT PIGALL'S.

Jean-Robert considered Mr. Brown part of the management team of Jean Robert at Pigall's. (de Cavel dep. at 50). Accordingly, Mr. Brown played a considerable role in planning, conceptualizing and preparing the restaurant in the months before it opened to the public. (Brown dep. at 72). Indeed, because Jean-Robert was unexpectedly called out of the country due to a family emergency, Mr. Brown was largely responsible for

---

[3] The position not only appealed to Mr. Brown because of his desire to work with Jean-Robert again, but because he had begun his fine dining career as a busser at the original Pigall's decades earlier. (de Cavel dep. at 15).

[4] Throughout his deposition, Mr. Wade consistently referred to Mr. Brown's compensation as a "guaranteed minimum" or "guaranteed compensation" rather than salary. (Wade dep. 31, 43, 48-49). However, despite Plaintiffs counsel's best efforts to determine the difference between the two, it appears that the terms are interchangeable. (Wade dep. at 48-49).

setting up the structure for the "front of the house" of the new restaurant.[5] (de Cavel dep. at 56).

When the restaurant opened in August, 2002, Mr. Brown continued to serve as the individual in charge of overseeing and operating the front of the house. (de Cavel dep. at 53; Brown dep. at 50; Dep. ex. 9--Affidavit of Richard Brown at ¶4). He placed advertisements for open positions and interviewed all potential servers, bussers, and hosts. (Brown dep. at 59-60; Brown Affidavit at ¶5; Wade dep. at 56). Although he introduced Jean-Robert to all members of the wait staff before hiring them, Mr. Brown made the final decision regarding who would be hired and Jean-Robert never disagreed with Mr. Brown's choice of employees. (Brown dep. at 53-54, de Cavel dep. at 19-20). Similarly, while Mr. Brown always ran termination decisions by Jean-Robert out of respect for the latter's status as owner of the restaurant, Jean-Robert viewed such decisions as part of Mr. Brown's role, explaining to him that "you are the maitre d'. It's your—it's your restaurant and if you don't think this person should be there, this person should not be there." (de Cavel dep. at 20; Brown dep. at 57).

Following their hire, Mr. Brown was responsible for training all members of the front of the house staff as well as the valets. (Brown dep. at 50, 52; Brown Affidavit at ¶ 5). He also created and maintained the employee scheduling system and was charged with predetermining the overall staffing needs of the restaurant on any given night based upon the number of reservations, private parties, and other factors potentially influencing volume of business. (*Id.* at 50, 57, 60; de Cavel dep. at 49-50). At the

---

[5] From an operational standpoint, restaurants are often divided into two main areas: the front of the house and the back of the house. (de Cavel dep. at 53). The front of the house refers to all employees and space that the customer regularly comes in contact with, while the back of the house refers to areas and employees such as the kitchen and cooks which the customer does not typically see. (*Id.*; Wade dep. at 28).

- 4 -

beginning of each evening prior to the restaurant's opening, Mr. Brown conducted a pre-shift meeting with the staff which was often attended by Jean-Robert to discuss previous issues, problems, and successes as well as current menu specials, notable guests with reservations, and individual employee assignments. (de Cavel dep. at 21-22; Brown dep. at 77-78).

During the restaurant's hours of operation, Mr. Brown was responsible not only for greeting and seating guests but also for overseeing every aspect of the restaurant outside the kitchen. (Brown Affidavit at ¶4). Thus, if he saw a server struggling, noticed a customer needing a refill, or even saw that a bathroom required cleaning, Mr. Brown ensured that the issue was promptly resolved because "managers always step in and help...as a manager, you do anything that needs to be done." (Brown dep. at 59). Moreover, at the end of each evening Mr. Brown's closing duties included removing money from the cash register at the bar, counting it, and depositing it in the safe. (Brown dep. at 51, 64). Each of the servers gave Mr. Brown a report stating their gross sales and information about their tips, which Mr. Brown routinely entered into an Excel spreadsheet to be utilized by the office manager to compute payroll the following morning. (Brown dep. at 45, 51, 81-82). Because he was often the last person to leave in the evenings, Mr. Brown had his own set of keys to the restaurant. (*Id.* at 82).

In addition to his considerable responsibilities with regard to oversight of the staff and the restaurant's daily operation, Mr. Brown was also responsible for maintaining the restaurant's reservation system and overseeing private dining services. (Brown dep. at 50-51, Brown Affidavit at ¶6). He made sure the dining room stayed clean and regularly scheduled carpet cleanings and light maintenance work. (Brown dep. at 50, 83-84; de Cavel dep. at 49).

**D. Martin Wade's Role at Jean-Robert at Pigall's.**

As the sole investor and 80% owner of Jean Robert at Pigall's, Mr. Wade had fairly regular contact with the restaurant and its employees.[6] (Wade dep. at 12, 20, 26). First, Mr. Wade was responsible for setting Jean-Robert's salary. (*Id.* at 53-54). While in town, he would stop by a couple of times per week and he maintained a mail slot at the restaurant for the delivery of documents related to Pigall's. (*Id.* dep. at 18-19). Mr. Wade required his office managers to send him sales reports on a daily basis and he also received monthly financial statements at his request. (*Id.* at 24-25, 63). Mr. Wade regularly met with Jean-Robert, his office manager Mellissa Blevins, and/or his external accountant Bob Kessler to discuss the company's financial status. (*Id.* at 25-26). During these meetings, Mr. Wade would make suggestions to increase the profitability of the enterprise; on at least one occasion he suggested raising menu prices. (*Id.* at 27). Mr. Wade had discussions with Jean-Robert regarding other issues facing the restaurant as well, such as the need to hire a new cleaning service if the carpets were not being properly maintained. (*Id.* at 59). Mr. Wade prepared and filed the restaurant's tax returns on an annual basis. (*Id.* at 11, 35).

**E. THE TIP POOL AT JEAN-ROBERT AT PIGALL'S.**

Like most restaurants, Jean Robert at Pigall's took advantage of the "tip credit" available under the Fair Labor Standards Act in order to avoid paying its customarily tipped employees the full amount of the federally mandated minimum wage. (Wade dep. at 42; Wade dep. ex. 11). Thus, servers, food runners, bartenders, and bussers'

---

[6] Both Jean-Robert and Mr. Brown maintain that Mr. Wade had a far more active role in the management of the restaurant than Mr. Wade admitted to during his deposition. Indeed, Jean-Robert described Mr. Wade as the business partner and "overseer" responsible for all final financial decisions associated with the restaurant's operation. (de Cavel dep. at 29, 32, 45-47, 54). However, for the purpose of this motion Plaintiff will only attribute to Mr. Wade the responsibilities that he himself acknowledged at his deposition.

paychecks reflected two sources of income: an amount equal to half the minimum wage for each hour worked and a share of the tips collected for each shift worked during a pay period. (Wade Dep. ex. 12--Affidavit of Melissa Blevins at ¶4).

The amount of tips received by each individual employee for a given shift was determined pursuant to a tip pooling system developed by Mr. Wade. (Brown dep. at 55-56). Although the tip pool existed in various incarnations over the years, it functioned in the same manner from 2006 until January 2009. (Brown dep. at 69-70). Under that system, each member of the wait staff was required to contribute an amount of their tips equal to 17% of their gross sales for each shift into a tip pool.[7] (Affidavit of Melissa Blevins at ¶3; Wade dep. at 38; Brown dep. at 68,74). The following day, Melissa Blevins, the restaurant's office manager, would calculate the total amount of tips collected by the wait staff by adding together each server's contribution to the pool. (Blevins Affidavit at ¶3). From that total, she would then determine the amount of money each eligible employee would receive based upon the "share" he was entitled. (*Id.* at ¶3).

Pursuant to Mr. Wade's direction, the aforementioned employees were not the only ones to receive a share of the proceeds from the tip pool. (Brown dep. at 45-47). Mr. Brown, whose compensation agreement with Mr. Wade entitled him to receive $2,884.80 every two weeks ($75,000 per year), was also assigned one share of the tip pool each evening. (Blevins Affidavit at ¶3; Brown Affidavit at ¶2; Brown dep. at 45-47; de Cavel dep. at 23). This was the first and only time in Mr. Brown's long career as a Maitre d' that he had been included in a restaurant's tip pool. (Brown dep. at 12, 16, 18).

---

[7] For instance, if a bill totaled $100.00 and the customer added a $17.00 gratuity, the server would be required to submit the entire $17.00 amount to the tip pool. On the other hand, if the server received a $20.00 tip on a $100.00 bill, he or she would contribute $17.00 to the tip pool and keep the remaining $3.00.

While other employees' share of the tip pool represented monies over and above their base salary, Mr. Brown's share was used to offset Defendants' salary obligation to him.[8] (Brown Affidavit at ¶2; Blevins Affidavit at 5; Brown dep. at 76). Thus, the amount that Defendants would pay him every two weeks was determined by the amount of his tips shares—if no tips were received Defendants would have to pay the entire $2,884.80, if his tips totaled the amount of his minimum guaranteed compensation Defendants would pay him nothing. (Wade dep. at 43-44, 48, 51).

### F. MARTIN WADE UNILATERALLY DECIDES TO SHUT DOWN JEAN ROBERT AT PIGALL'S AND DECREASE MR. BROWN AND JEAN-ROBERT'S SALARY.

On January 2, 2010, Mr. Wade suddenly and unexpectedly delivered a memorandum to Jean-Robert stating his intention to close Jean-Robert at Pigall's effective February 28, 2010. (de Cavel dep. at 39-40, Brown dep. ex. 2; Wade dep. 63-64). The letter further stated that the restaurant would be opened later that year under a new name and concept and while Jean Robert would be permitted to remain Chef, he would have no ownership interest in the new venture. (Brown dep. ex. 2). The memorandum further stated that, effective immediately, Jean-Robert's salary would be reduced from $100,000.00 per year to $80,000.00 per year and that Richard Brown's guaranteed salary would be reduced to $40,000.00 per year. (*Id.*). Jean-Robert had not been consulted regarding any of the management decisions contained in Mr. Wade's memorandum. (de Cavel dep. at 47-48).

## II. LAW AND ANALYSIS

### A. STANDARD OF REVIEW.

---

[8] For example, if Mr. Brown's share of the tip pool over a two week period represented $500.00, Mr. Brown's paycheck would still reflect the amount of $2,884.80--$2384.80 paid by the restaurant and $500.00 paid by the tip pool. (Brown dep. ex. 7). The only time Mr. Brown would receive a different amount was if a customer left a tip specifically and exclusively for his benefit. (Brown dep. at 36-37, 40-41).

Under Rule 56 of the Federal Rules of Civil Procedure, a party that moves for summary judgment is entitled to have the motion granted if the record, viewed in a light most favorable to the non-moving party, establishes that no genuine issues of material fact exist which preclude the entry of judgment in the moving party's favor as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Presentation of a mere scintilla of evidence is not enough to establish that material factual issues exist, nor is reliance upon mere allegations, conjecture or implausible inferences sufficient. *Id.* at 587. Unless the non-movant can present evidence that is sufficient to support a verdict in favor of the non-movant by a rational trier of fact, summary judgment should be granted. *Celotex* at 324, 327.

**B. DEFENDANTS DCHW, LLC AND MARTIN WADE ARE LIABLE UNDER THE FAIR LABOR STANDARDS ACT FOR FAILURE TO PAY THEIR CUSTOMARILY TIPPED EMPLOYEES THE FEDERAL MINIMUM WAGE.**

**1. Defendant Martin Wade can be held liable as a matter of law for violations of the FLSA because he is an "employer" as that term is contemplated in the Act.**

Under the FLSA, only "employers" may be held liable for violation of federal wage and hour laws. *See, e.g.*, *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994). However, the FLSA broadly defines the term employer to include "any person acting directly or indirectly in the interest of an employer in relation to any employee." 29 U.S.C. 29 U.S.C. § 203(d). The Sixth Circuit has recognized that "the FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA," and that the remedial purpose of the Act requires courts "to define employer more broadly than the term would be interpreted in traditional common law

applications." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991), citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973). Whether a party is an employer within the meaning of the FLSA is a legal determination. *Elliot*, 942 F.2d at 965.

Pursuant to this definition, the Sixth Circuit has held that "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Fegley*, 19 F.3d at 965, *quoting Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983). Federal courts have considered various combinations of the following factors reliable indicia that a corporate officer is also an employer:

- The officer has a significant or "high" position within the corporation. *See U.S. Dept. of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1195) (President of corporation is employer); *see also Elliot*, 942 F.2d at 966 ("Top man" at the corporation was an employer); *Hernandez v. City Wide Insulation of Madison, Inc.*, 2006 WL 1993552 (E.D. Wis. 2006) ("courts routinely conclude that liability under the FLSA depends on the individual's high position within the company").

- The officer has a significant ownership interest in the corporation. *See Fegley*, 19 F.3d at 1131; *Cole*, 62 F.3d at 778.

- The officer has the authority to issue checks on the corporate account or otherwise controls the "purse strings" of the corporation. *See Martin v. Monks Corp.*, 805 F. Supp. 500, 502 (S.D. Ohio, 1992); *Cole,* 62 F.3d at 778; *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984).

- The officer exercises his authority to determine employee salaries. *Cole*, 62 F.3d at 778; *Elliot*, 942 F.2d at 966; *Fegley*, 19 F.3d at 1131.

- The officer has the power to continue or terminate the corporation's operations. *Elliot*, 942 F.2d at 965.

- The corporation functioned for the corporate officer's profit. *Elliot*, 942 F.2d at 966.

In short, "one who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the purposes of the FLSA." *Cole*, 62 F.3d at 778.

The record in this case makes clear that Mr. Wade meets this definition of "employer" as a matter of law. At all times relevant to the issues in this case, Mr. Wade held an 80% ownership interest in DCHW, LLC and "bankrolled the entire operation" by providing 100% of the restaurant's financing. (Wade dep. at 12, 20-21). He stopped by the restaurant several times per week, received mail on the premises, and had a hand in routine matters such as finding a new company to clean the carpets. (*Id.* at 18-19, 59). Mr. Wade directed his office manager to provide him with daily sales and monthly financial reports so that he could discuss the financial status of the restaurant with Jean-Robert. (*Id.* at 24-26, 63). He also prepared the restaurant's annual tax returns and purposefully took a tip credit against the restaurant's federal tax liability. (*Id.* at 11, 35).

Mreover, Mr. Wade exercised considerable control over managerial employees such as Jean-Robert and Richard Brown. He set Mr. Brown's salary in conjunction with Jean-Robert and established Jean-Robert's salary himself. (*Id.* at 30-31, 53-54). In early January, 2009, Mr. Wade unilaterally decided—without consulting any other member or employee of DCHW, LLC—that he would shut down Jean Robert Pigall's at the end of the following month and would significantly reduce both Jean-Robert and Mr. Brown's salary in the interim. (de Cavel dep. at 39-40, Brown dep. ex. 2; Wade dep. 63-64). Mr. Wade explained that he had "golden rule authority" to make such changes because he was "writing all the checks" and "funding the operation." (Wade dep. at 65). Mr. Wade

assumed responsibility for ensuring that all employees of the restaurant received their final paychecks when Jean Robert at Pigall's closed its doors in February, 2009. (Wade dep. at 41). Under these circumstances, Mr. Wade clearly had "operational control" over the restaurant. *See, e.g. Chung v. New Silver Palace Restaurant*, 246 F.Supp.2d 220, 224, 227 (S.D.N.Y. 2002) (shareholder and member of the board of directors who had check signing authority, attended a meeting with other board members to discuss managers' salaries, and fielded manager complaints about other employees was an "employer" under the FLSA).

Finally, the fact that Mr. Wade claims he had no role in the restaurant on a day to day basis should not prevent this Court from finding that Mr. Wade is an "employer" as that term is contemplated under the FLSA. "To be classified as an employer, it is not required that a party have exclusive control of a corporation's day to day functions. The party need only have operational control of *significant aspects* of the corporation's day to day functions." *Elliot*, 942 F.2d at 966. Thus, in *Elliot* the Sixth Circuit concluded that an individual defendant was an "employer" because he was "the top man" and because the "corporation functioned for his profit." *Id.*; see also *Donovan v. Janitorial Services, Inc.*, 672 F.2d 528, 531 (5th Cir. 1982) (although the day to day management of the corporation was in the hands of the company president, defendant shareholder was an "employer" under the FLSA because his considerable investment in the company gave him "ultimate, if latent, authority over its affairs").

Considering the record in the light most favorable to the non-moving party as required by Rule 56, no genuine issue of fact exists to reasonably dispute Plaintiffs' assertion that Mr. Wade was an "employer" under the FLSA. Accordingly, this Court

should find that Mr. Wade, along with DCHW, LLC, is jointly and severally liable for any violation of federal wage and hours laws at Jean Robert at Pigall's.

### 2. Defendants DCHW, LLC and Martin Wade unlawfully utilized the FLSA's tip credit provision by requiring their employees to participate in a tainted tip pool while at the same time paying them less than the federally mandated minimum wage.

Under the FLSA, an employer may utilize a tip credit to pay tipped employees[9] a direct wage less than the federal minimum wage.[10] *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998). However, three conditions must be met in order for an employer to legally qualify for the tip credit: (1) the employer must notify the employee of its intention to take the tip credit; (2) all tips received by the employee must be retained by the employee, except with respect to valid tip pools; and (3) the employee must receive at least minimum wage when his direct wages and tips are combined. 29 U.S.C. § 203(m). Each of these requirements must be "strictly construed" and an employer will run afoul of the FLSA unless it fully complies with each of the statutory requirements. *Chan v. Sung Yue Tung Corp.*, 2007 WL 313483 (S.D.N.Y 2007). The employer bears the burden of proving that it is entitled to take the tip credit. *Bernal v. Vanker Enterprises, Inc.*, 579 F.Supp.2d 804 (W.D. Texas 2008).

In this case, the record unequivocally reflects that DCHW, LLC and Martin Wade took the tip credit during the years 2006, 2007, and 2008 and therefore did not directly pay their tipped employees the full federal minimum wage. (Wade dep. ex. 11). However, during that same period the record also shows that Defendants failed to

---

[9] A "tipped employee" is any employee engaged in an occupation in which he customarily and regularly receives more than $30.00 per month in tips." 29 U.S.C. § 203(t). In this case, "tipped employees" refers to the servers, food runners, and bussers at Jean Robert at Pigall's.
[10] The "tip credit" is a legally permitted portion of the statutory minimum wage that an employer is excused from paying because its tipped employees have earned a certain amount of money in tips. 29 C.F.R. 531.52.

comply with one of the statutory pre-conditions necessary to qualify for the tip credit: employees participating in the tip pool were not permitted to retain all of the tips they received. *See* 29 U.S.C. § 203(m). More specifically, Defendants required their customarily tipped employees to participate in a tip pool that was tainted by unlawful employer participation. As a result, Defendants use of the tip credit was invalid and they should be held liable for failure to comply with the FLSA's minimum wage provisions.

> a. <u>A tip pooling system which permits employer participation is invalid as a matter of law under the FLSA.</u>

The only exception contained in 29 U.S.C. § 203(m)'s requirement that each tipped employee retain all tips received by that employee permits tips to be disbursed via valid tip pooling arrangements. Tip pooling refers to the practice of gathering gratuities or a partial amount of those gratuities received from customers in a central pool for distribution to other employees. In order for a tip pool to be considered valid, however, only employees who "customarily and regularly receive tips" are permitted to participate. 29 U.S.C. § 203(m), *see also Myers v. Copper Cellar Corp.*, 192 F.3d 546 (6th Cir. 1999).

As a result of this requirement, federal courts have consistently and without exception found that employers relying upon the FLSA's tip credit provision are expressly prohibited from participating in tip pools. "Congress, in crafting the tip credit provision...of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employee's tips." *Chan*, 2007 WL 313483, *citing Chung v. New Silver Palace Rest.*, 246 F.Supp.2d 220, 228 (S.D.NY. 2002). Moreover, the relevant regulations state that "tips must be free of employer control and may not be

used to kick back directly or indirectly to the employer." 29 C.F.R. § 531.35 and 531.52. Similarly, the Department of Labor's Field Operations Handbook explains that "the effect of the language of [§ 203(m)] precludes an agreement between an employer and a 'tipped employee' that any part of the tips received by such employee belongs to the employer and must be turned over to the employer." § 30d01(a). Included in this prohibition against employer participation in tip pools is participation by managerial employees. *See, e.g., Ayres v. 127 Restaurant Corp.*, 12 F.Supp. 305 (S.D.N.Y. 1998).

In the event a court determines that an employer has inappropriately participated in a tip pool with its employees, the employer will be liable in damages for each hour an employee worked while the tip pooling scheme was in place. *See, e.g., Myers,* 192 F.3d at 550-551.

> b. <u>The tip pooling system at Jean Robert at Pigall's was tainted by employer participation.</u>

The record is clear that Defendants violated the FLSA's prohibition against employer participation in tip pools in at least two distinct ways: (1) Defendants used a portion of the tip pool to offset their own salary obligations to Mr. Brown; and/or (2) Defendants permitted Mr. Brown, a managerial employee, to receive proceeds from the tip pool.

> i. The tip pool was invalid because a portion of the tips were used by Defendants to offset their own salary obligation to Mr. Brown.

Prior to the opening of Jean Robert at Pigall's, Mr. Wade informed Richard Brown that he would be paid $75,000.00 per year for his services as Maitre d'. (Wade dep. at 52-53; Brown dep. at 20). Pursuant to this agreement, the restaurant owed Mr.

Brown $2,884.80 in guaranteed compensation every two weeks. (Wade dep. at 43-44, 48, 51).

Rather than meet this salary obligation to Mr. Brown with monies entirely from its own accounts, however, Defendants chose to attribute one share of the tip pool from each shift to Mr. Brown and then use that money to pay a portion of the $2,884.80 already owed him. (Blevins Affidavit at ¶3; Brown Affidavit at ¶2; Brown dep. at 45-47). Thus, the tip pool did not financially benefit Mr. Brown—he received $2,8884.80 regardless of the amount of tips collected during any bi-weekly pay cycle—but rather financially benefited Defendants because it appreciably reduced the amount of money that they would have owed Mr. Brown if no tips had been collected. (Wade dep. at 43-44, 48, 51). This system clearly violates the Department of Labor's directive that tips may "not be used to kick back directly or indirectly to the employer" and constitutes unlawful employer participation in a tip pool. 29 C.F.R. § 531.35 and 531.52.

A federal court faced with the question of whether an employer may use proceeds from a tip pool to offset his own independently existing wage obligations found that the scheme violated the FLSA. In *Chan*, the court found that owners of a New York restaurant had failed to comply with the strict requirements of the FLSA by retaining a portion of the tip pool to help pay part-time workers that the restaurant had previously agreed to pay on a solely hourly basis. 2007 WL 313483 at 18. *See also Sorenson v. CHT Corp.*, 2004 WL 442638 (N.D. Illinois 2004) (Defendants violated FLSA tip credit provisions by using tip money to pay salaries of non-tipped employees).

Defendants' use of Mr. Brown's share of the tip pool to defray their own independent salary obligations constituted employer participation in the tip pool and rendered Defendants' use of the tip credit from 2006 until 2009 unlawful and

unwarranted. Because this tip pooling scheme violated the FLSA as a matter of law, summary judgment should be granted.

> ii. The tip pool was invalid because Mr. Brown, a managerial employee, was permitted to receive some of the proceeds from the pool.

Even if this Court finds that Defendants did not violate the FLSA by using a portion of the restaurant's tip pool to pay their own independent salary obligation to the Maitre d', summary judgment is still appropriate because the record reflects that Mr. Brown was an "employer" as that term is contemplated in the Act and therefore ineligible to participate in the tip pool in any manner.

As explained above, the FLSA broadly defines employer as "any person acting directly or indirectly in the interest of an employer in relation to its employees." 29 U.S.C. § 203(d). As a result of this broad definition, federal courts have found that restaurant managers may be considered "employers" ineligible to participate in tip pools. In order to aid in the determination of whether a manager is also an employer, courts apply the "economic reality" test which considers whether the manager at issue: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Carter v. Dutchess Cmty. Coll.*, 735 f.2d 8, 12 (2d Cir. 1984). However, no one factor is dispositive and "a court is free to consider any factors it deems relevant to its assessment of the economic reality." *Chan v. Triple 8 Palace*, 2006 WL 851749 (S.D.N.Y. 2006).

For instance, in *Ayres*, a district court found that a restaurant employee's continued participation in the tip pool was improper after his promotion to general manager because he (1) had full authority to suspend, terminate and hire; (2) assumed

greater responsibility for the restaurant's budget including analyzing payroll and food costs; and (3) received a weekly salary irrespective of hours worked. 12 F.Supp. at 307-308.

In this case, the record makes clear that Mr. Brown was a salaried member of Jean Robert at Pigall's management and held authority sufficient to bar his legal participation in the restaurant's tip pool. Before the restaurant opened, Mr. Brown was responsible for setting up the structure of the "front of the house" in the manner which he saw fit. (de Cavel dep. at 56). He independently supervised and trained all members of the wait staff, had authority to hire and fire those employees, and was exclusively responsible for setting their schedules and daily assignments. (Brown dep. at 53-54, 57; de Cavel dep. at 19-20, 49-50). Mr. Brown also processed the servers' financial information, including their tip share, at the end of each shift so that the office manager could compute payroll the following morning. (Brown dep. at 45, 51, 81-82). Indeed, Jean-Robert, a shareholder in DCHW, LLC, testified that Mr. Brown was part of the restaurant's management team. (de Cavel dep. at 50).

Under these circumstances, where the economic reality strongly indicates that Mr. Brown was a manager and "employer" as that term is contemplated under the FLSA, Defendants violated the FLSA by permitting Mr. Brown to participate in their restaurant's tip pool.

### III. CONCLUSION

DCHW LLC and Martin Wade violated the FLSA as a matter of law by taking the tip credit while at the same time forcing their customarily tipped employees to participate in a tip pool unlawfully tainted by employer participation. Accordingly,

Plaintiffs respectfully requests that this Court enter partial summary judgment in their favor on the issue of Defendants' liability under the FLSA.

>Respectfully submitted,
>
>**THE LAW OFFICE OF MARC MEZIBOV**
>
>/s/Marc D. Mezibov
>Marc D. Mezibov (No. 0019316)
>Susan M. Lawrence (No. 0082811)
>401 E. Court Street, Suite 600
>Cincinnati, Ohio 45202
>Telephone (513) 621-8800
>Telecopier (513) 621-8833
>
>Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served via electronic and regular mail to Gregory Rogers and Ryan Martin, Taft Stettinius and Hollister, LLP, 425 Walnut St., Suite 1800, Cincinnati, Ohio 45202-3957, on this 14th day of May 2010.

>/s/Marc D. Mezibov